# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA
# INDIANAPOLIS DIVISION

| | |
|---|---|
| NATIONAL FOUNDATION FOR SPECIAL NEEDS INTEGRITY, INC., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 1:15-cv-00545-TWP-DKL ) |
| DEVON C. REESE, as Personal Representative for THE ESTATE OF THERESA A. GIVENS, deceased, | ) ) ) ) |
| Defendant. | ) ) ) |
| DEVON C. REESE, as Personal Representative for THE ESTATE OF THERESA A. GIVENS, deceased, | ) ) ) ) |
| Counter Claimant, | ) ) |
| v. | ) ) |
| NATIONAL FOUNDATION FOR SPECIAL NEEDS INTEGRITY, INC., | ) ) ) |
| Counter Defendant. | ) |

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER FOLLOWING BENCH TRIAL

A bench trial was held in this action on January 9, 2017 and January 13, 2017. The Counter Claimant, Devon C. Reese as Personal Representative of the Estate of Theresa A. Givens ("the Estate"), appeared in person and by counsel James A. Beckemeir and Wanda E. Jones. Counter Defendant National Foundation for Special Needs Integrity, Inc. ("National Foundation") appeared by counsel David W. Gray, Matthew S. Tarkington and Suzanne R. Gaidoo. The issues before the Court at trial are the Estate's counterclaim for reformation and National Foundation's

defense of laches as to the counterclaim. Upon consideration of the evidence presented during the bench trial[1], the Court now issues its Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a)(1). Any finding of fact that is more properly considered a conclusion of law is adopted as such. Similarly, any conclusion of law that is more properly considered a finding of fact is adopted as such.

## I. FINDINGS OF FACT

National Foundation is a not-for-profit corporation whose purpose is to act as trustee to pooled special needs trusts. A special needs trust is a trust created for the benefit of a beneficiary with a disability who is receiving means-tested governmental benefits, such as Supplemental Security Income or Medicaid. A special needs trust protects a disabled person's eligibility for current or future public benefits while simultaneously allowing the person with disabilities access to additional funds to pay for expenses not covered by public benefits. The trust property of numerous trust beneficiaries (called "members") is "pooled" for the purpose of custody, management, and investment in accordance with 42 U.S.C. §1396(d)(4)(C). A separate "sub-account" is established and administered for the sole benefit of each specific trust member. At the time of a pooled trust member's death, the funds remaining in the deceased member's sub-account must be used to pay back Medicaid, and if funds still remain after repayment, the funds either: (a) remain in the pooled trust for the benefit of the other pooled trust members, or (b) can be distributed to others pursuant to the beneficiary's wishes that are clearly stated in the trust documents.

Theresa Givens ("Givens") was a forty-nine year old, unmarried mother of three adult children, who was severely injured in 2009 by the medical use of Gladolium dye. Givens was a member of a products liability class action lawsuit and was represented by Brown & Crouppen,

---

[1] In addition, the Court considers the parties' Stipulation of Facts (Filing No. 86).

P.C. ("Brown & Crouppen") law firm. In July 2011, Givens agreed to a $500,000.00 settlement of which Brown & Crouppen received 40% as its fee, plus reimbursement of its costs. Givens received $254,847.76 in net settlement proceeds. Prior to receiving the settlement proceeds, Seth Webb ("Webb"), Givens' attorney at Brown & Crouppen, advised her to place all of her net settlement funds into a pooled special needs trust. Brown & Crouppen gave her the name of both National Foundation and Midwest Special Needs Trust to discuss distribution of her settlement benefit.

On or about June 1, 2011, Givens contacted K. Shane Service ("Service"), National Foundation's then-general counsel, to discuss placing her settlement funds into a pooled special needs trust. At their meeting, Givens told Service that she had six goals for her settlement funds. She wished to use her settlement funds to purchase: 1) a primary residence; 2) a home for her son; 3) an income-producing storefront property; 4) two cars; 5) a vacation; and 6) saving bonds of an undisclosed amount for her three children and all of her grandchildren. Givens also informed Service that she wanted to purchase an annuity with the left over proceeds and to live off the interest. Service talked to Givens about Medicaid payback, and explained the pros and cons of a pooled trust. Givens was concerned about her children and she told Service that ultimately, after Medicaid payback and any liens, she wanted the proceeds to go to her children. Service explained that in the majority of these cases, when a beneficiary passes away, the pooled trust that administers the trust has the legal right to retain the money. The conversation ended with Givens stating that she needed to "chew on this." Given her stated goals, Service expected never to hear from Givens again.

After speaking with Givens, Service emailed Webb and Andee McGaughey ("McGaughey"), the paralegal at Brown & Crouppen who was assigned to Givens' case. (Tr.

Exhibit 105.) In the email, Service reminded McGaughey that a special needs trust is subject to the sole benefit rule and cannot be used for the primary benefit of anyone other than the beneficiary. Service noted that he had informed Givens that, given her stated goals, a special needs trust might not be the proper vehicle for her because it would not allow Givens to purchase housing for her family members, give gifts to her children and grandchildren, and would only allow her to purchase one vehicle.

On July 11, 2011, Givens met with her personal injury attorneys at Brown & Crouppen who again advised that the settlement funds needed to be placed in the trust so that Givens would not lose her public health benefits. On July 20, 2011, despite the advice of counsel regarding the risk of losing her needs based government benefits, Givens instructed Brown & Crouppen to place only $184,000.00 in a special needs trust and distribute the remaining portion by check made payable to her. Givens informed her attorneys at Brown & Crouppen that she intended to use the funds that were not placed in the trust to pay off her debts, open a bank account, buy a car for her daughter, and give $50,000.00 to her son.

Eight days later, on July 28, 2011, Givens contacted her attorneys at Brown & Crouppen and instructed them to place her entire settlement into a special needs trust. On that same day, Givens informed McGaughey that she was frustrated with her children because she felt that she was being pressured by them to give them her settlement funds. Givens also told McGaughey that she was afraid her children would take the money, she would be left without anything, and that she could have everything taken away from her.

On August 9, 2011, Givens executed a Joinder Agreement, thereby joining the pooled trust operated by National Foundation. (Tr. Exhibit 102.) McGaughey went to Givens' home to pick up the agreement and signed the document as a witness, indicating that she was present when

4

Givens signed the agreement. McGaughey, however, did not assist Givens in filling out the agreement. McGaughey then delivered the executed agreement to Brown & Crouppen. Although Brown & Crouppen was Givens' legal counsel, at the time she completed the Joinder Agreement an attorney was not present and no Brown & Crouppen attorney reviewed the Joinder Agreement before sending it to National Foundation. Givens listed herself as the only "contingent/ remainder/residual" beneficiary. The pertinent provisions in the Joinder Agreement state as follow:

> **IV.     DISTRIBUTIONS UPON THE DEATH OF THE BENEFICIARY:**
>
> Amounts remaining in the trust upon the death of the Beneficiary shall be distributed in accordance with §13611(b) of the Omnibus Budget Reconciliation Act of 1993 (OBRA), Public Law 103-66, codified at 42 U.S.C. §1396p(d)(4)(C). Accordingly, to the extent that amounts remaining in the beneficiary's account upon the death of the Beneficiary are not retained by the trust, the trust shall pay to the state of Missouri such remaining amounts in the account an amount equal to the total amount of medical assistance paid on behalf of the Beneficiary under the State of Missouri's Medicaid plan.
>
> Except in the event that this Article Fourteen may be in the future amended to effectuate the letter, spirit and purpose of 42 U.S.C. §1396p(d)(4)(C)(iv), the National Foundation for Special Needs Integrity, Inc. shall not retain any portion of the Beneficiary's trust Sub-Account upon his or her death. Rather, all such amounts shall be reimbursed to the state of Missouri, by and through the Missouri Department of Health and Family Services, up to the full amount that it has expended on the Beneficiary, both before and after the creation of this trust.
>
> If any money remains after the state of Missouri has been reimbursed in full, said money shall be distributed in accordance with Section V, below.
>
> If no secondary Contingent/Residual/Remainder Beneficiaries survive or if none are named in Section V below, then and only then shall said money remain with the trust.
>
> ….
>
> If any amounts remain after the state of Missouri (and any other state that may receive proportionate reimbursement pursuant to Section 14.2 of the accompanying Declaration of Trust) has been reimbursed in full, as described above, the remaining amounts shall be distributed in accordance with the Joinder Agreement under which the Beneficiary has enrolled in the pooled trust.

5

(Tr. Exhibit 102 p.13).

### V.  CONTINGENT/REMAINDER/RESIDUAL BENEFICIARIES:

Please tell us below to whom you would like us to pay out the Remainder of your Sub-Account should there be any money left after the state of Missouri has been reimbursed for the Medicaid services it has rendered to you during your lifetime. *This person can be an individual person, such as a family member; or an organization, such as a favorite church or charity*. YOU MUST NAME AN ACTUAL PERSON OR ENTITY. DO NOT WRITE VAGUE DESCRIPTIONS OF CLASSES OF PESONS, SUCH AS "MY HEIRS AT LAW," OR "MY ISSUE" OR "A YET TO BE IDENTIFIED CHARTIABLE ORGANIZATION."

**Contingent/Remainder/Residual Beneficiary #1:**

| | |
|---|---|
| Name: | Theresa Givens |
| Address: | 1723 Cochran Place<br>St. Louis, MO 63106 |
| Telephone Number:<br>(Include Area Code) | 314-484-2558 |
| Percentage: | 100% |

….

*If you name more than one Contingent/Remainder/Residual Beneficiary, please check to make sure the percentages add up to 100%.*

*Any Remainder shares for a Contingent/Remainder/Residual Beneficiary named in this section who does not survive the Beneficiary will lapse and be distribute in equal shares to all other named Contingent/Remainder/Residual Beneficiaries.*

*Id*. at 14 (emphasis in original). On October 10, 2011, Givens deposited $254,847.76 into her trust sub-account.

In mid-November 2011, Givens informed Reese that she had money in her sub-account and she wanted him to use that money to help his siblings. Sadly, on November 19, 2011, just a few weeks after funding the trust, Givens died intestate. As a result, at the time of her death, $234,181.23 remained in her trust sub-account, and it was later determined that no repayment was owed to Medicaid.

6

On November 23, 2011, Givens' daughter, Whitney, called National Foundation and asked about the remainder funds. That same day, Givens' attorneys at Brown & Crouppen spoke with Service regarding distribution of the remaining trust funds to Givens' adult children. National Foundation informed Givens' attorneys at Brown & Crouppen that Givens' children were not listed as beneficiaries on the Joinder Agreement, rather, Givens designated herself as the remainder beneficiary. As a result, National Foundation stated that it would not distribute the funds to Givens' adult children but would, instead, retain the funds in the trust's remainder share account for the benefit of other pooled trust members, consistent with the terms of the trust document.

Shortly thereafter, Andrew Martin ("Martin"), an attorney and friend of Givens' family, contacted National Foundation regarding the remainder funds. In a letter dated January 18, 2012, Service explained to Martin that Givens failed to name any beneficiaries, and after the Missouri Department of Social Services was paid, issues would remain as to disposition of the balance. (Exhibit 112.) Service is uncertain whether he mailed the letter to Martin.

After Martin's efforts failed, Reese hired attorney James A. Beckemeier ("Beckemeier") to recover his mother's money. On November 14, 2012, Beckemeier opened an estate on behalf of Givens and Reese was appointed personal representative of the Estate. The Estate did not file a lawsuit to recover the remaining trust funds.

On January 8, 2013, National Foundation transferred $116,562.54 of Givens' remainder funds to National Foundation's "operating account."[2] On February 6, 2014, National Foundation transferred $104,031.39 of the remainder funds from Givens' account to National Foundation's operating account and "green room account."[3] During this period, National Foundation also

---

[2] National Foundation uses this account to pay for general operating expenses, overhead, salaries and other things.

[3] National Foundation uses this account as a "disbursing account" because no direct disbursements are made from a pooled account.

charged Givens' account a total of $13,586.30 for general fees, including legal fees. As of February 2014, Givens' trust account balance totaled $0.00.

On February 3, 2015, approximately two years after the Estate was opened, Beckemeier sent a letter to National Foundation on behalf of the Estate with a demand for distribution of the remainder funds to the Givens' children. In reply, on March 20, 2015, National Foundation sent a letter to Beckemeier, stating that it properly retained Givens' remainder funds because Givens did not name a secondary or contingent beneficiary.

On April 6, 2015, National Foundation filed this action seeking a declaration that the transfer of the funds into the trust's remainder share account was proper. ([Filing No. 1](#).) On June 29, 2015, Reese filed a counterclaim for recovery of the remaining trust funds. ([Filing No. 11](#); [Filing No. 24](#)). In particular, Reese sought reformation and deviation of the trust funds to reflect, what he believes are, the true wishes of Givens. *Id*. Both parties moved for summary judgment and, on October 26, 2016, the Court granted in part and denied in part National Foundation's motion for summary judgment and denied the Estate's request for summary judgment. ([Filing No. 81](#).) The Court specifically found that the pertinent sections of the trust agreement are unambiguous and National Foundation complied with the plain language of the trust documents; however, there remained a genuine issue of material fact regarding Givens' intent and whether equity in the form of reformation should intervene. On the defense of laches, the Court concluded that there remained a genuine issue of material fact as to inexcusable delay, to an implied waiver, and prejudice.

On January 9, and January 13, 2017, a bench trial was held regarding the remaining issues, namely the Estate's counterclaim for reformation and National Foundation's defense of laches as to the counterclaim.

## II.     CONCLUSIONS OF LAW

**A.     Reformation**

"Written instruments are presumed to reflect the intentions of the parties to those instruments." *Estate of Reasor v. Putnam Cty.,* 635 N.E.2d 153, 158 (Ind. 1994). However, even if an agreement is unambiguous, "a written instrument, including a trust, may be reformed on grounds of mistake upon 'clear and convincing evidence' not only of the mistake, but also of the original intent of the parties." *Id.* at 160; *see also Carlson v. Sweeney, Dabagia, Donoghue, Thorne, Janes & Pagos*, 895 N.E.2d 1191, 1199-1200 (Ind. 2008). "Evidence is clear and convincing if it leaves no reasonable doubt in the mind of the trier of fact as to the truth of the proposition in question." *In re Meyers*, 616 F.3d 626, 631 (7th Cir. 2010).

The Court concludes the Estate has not presented clear and convincing evidence that at the time Givens signed the Joinder Agreement she intended the remainder funds to transfer to her children. "The settlor's intent must be determined from the facts and circumstances surrounding the trust at the time of the execution of the trust." *Matter of Walz,* 423 N.E.2d 729, 733 (Ind. Ct. App. 1981).

The Estate contends the Joinder Agreement establishes clear and convincing evidence that Givens intended to benefit her children upon her death because when asked "how [Givens] might plan to use [her] trust Sub-Account," Ms. Given listed, among other things, to "help son w/student loans." (Tr. Exhibit 102 at 10.) The Estate argues that this statement makes it abundantly clear that Givens made a mistake and intended to use her proceeds to benefit at least one of her children. "A unilateral mistake on the part of the settlor is ordinarily sufficient to warrant reformation." *Carlson v. Sweeney, Dabagia, Donoghue, Thorne, Janes & Pagos,* 895 N.E.2d 1191, 1199 (Ind. 2008).

The Court finds Givens' statement, that she "might plan to use [her] trust Sub-Account" to "help son w/student loans," insufficient for the proposition that Givens intended the remainder funds to transfer to her three adult children. Givens' statement regards only her possible plan for the sub-account during her lifetime and does not speak to her intentions as to the remainder funds, nor does the statement mention Givens' other two children. In addition, because of the "sole benefit" and gifting rules, Givens' trust funds could not be used to "help son w/student loans". Even if Givens could use the trust funds to assist her son during her lifetime, this statement is not clear and convincing evidence that Givens intended the entire remainder funds to transfer to her three children upon her death.

The Estate argues Givens' statements to Reese a few days prior to her death in November 2011 is evidence of her intent. However, in August 2011, when she executed the Joinder Agreement, Reese was not present and he never discussed the provisions of the Joinder Agreement with his mother. The conversation in November 2011 is not clear and convincing evidence of Givens' intent in August 2011. Besides, on the same date in July 2011, when Givens contacted Brown & Crouppen to advise that she now wished to fund the pooled trust with all of her proceeds, she also advised McGaughey that she was being pressured by her adult children and concerned that they would take her money and she would be left without anything. The Estate urges the Court to discount the credibility of McGaughey's statement because she was aware the Estate was claiming that Brown & Crouppen had committed malpractice. However, there is no evidence to support any motivation on the part of McGaughey to testify falsely.

The Estate next asserts that Section IV of the Joinder Agreement is contradictory because one portion of Section IV provides that "[National Foundation] shall not retain any portion of the Beneficiary's trust Sub-Account upon his or her death." (Tr. 102 at 13). However, Section IV

also states that upon the death of Givens "[i]f any money remains after the state of Missouri has been reimbursed in full….the remaining amounts shall be distributed in accordance with the Joinder Agreement under which the Beneficiary has enrolled in the pooled trust…." but "[i]f no secondary Contingent/Residual/Remainder Beneficiaries survive or none are named in Section V [], then and only then shall said money remain with the trust." *Id.* The Estate contends, because of the contradiction, the Joinder Agreement lends no support for the assertion that Givens' intended to leave her remainder funds to National Foundation.

The Estate also relies on Service's testimony that, when drafting the Joinder Agreement, National Foundation intended the language to be confusing to Missouri Medicaid, and thus was confusing to participants. The Court is not persuaded by the Estate's argument. Service testified the while the Joinder Agreement was drafted to facilitate the trust company and/or secondary beneficiary being able to retain funds, it was not drafted to be confusing to "persons like Reese or courts." The Court notes that it previously found, as a matter of law, the pertinent sections in the Joinder Agreement unambiguous and not contradictory.

Looking at the Joinder Agreement itself, there is no evidence that Givens intended to leave the remainder funds to her three children. Givens listed only herself as remainder beneficiary and she does not mention any of her children in the Joinder Agreement. Accordingly, because the Estate has not presented clear and convincing evidence that Givens made a mistake and intended to transfer her remainder funds to her three children at the time of executing the Joinder Agreement, the Court **denies** the Estate's reformation claim.

**B.    Laches**

National Foundation asserts, even if the Court granted the Estate's reformation claim, the claim is barred by the doctrine of laches. Laches is an equitable defense that may be raised to stop

11

a person from asserting a claim that he or she would normally be able to assert. *Angel v. Powelson*, 977 N.E.2d 434, 445 (Ind. Ct. App. 2012) ("[l]aches is neglect for an unreasonable length of time, under circumstances permitting diligence, to do what the law should have done."). The equitable defense of laches may bar an opposing party's claim if the defending party establishes: (1) an inexcusable delay in asserting a known right; (2) an implied waiver arising from knowing acquiescence in existing conditions; and (3) a change in circumstances causing prejudice to the adverse party. *Id*. A mere lapse in time is not sufficient to establish laches. *Id*. It is also necessary to show an unreasonable delay that causes prejudice or injury. *Id*. Prejudice may be created if a party, with knowledge of the relevant facts, permits the passing of time to work a change of circumstances by the other party. *Id*.

The doctrine of laches applies here because the Estate waited more than three and a half years after Givens' death to take legal action, the Estate was aware of the existing conditions, and National Foundation would be prejudiced by the Estate's unreasonable delay. Givens died on November 19, 2011. Four days later, on November 23, 2011, National Foundation informed Givens' daughter and Brown & Crouppen that it intended to retain Givens' remainder funds. On November 14, 2012, Givens' children hired an attorney and opened an estate, however, the Estate never initiated legal actions and it waited over two years to send a formal demand to National Foundation seeking the transfer of Givens' remainder funds to her children. It was not until June 2015, that the Estate filed counterclaims to National Foundation's action.

The Estate argues that it was not clear National Foundation intended to retain the remainder funds until National Foundation formally communicated its intention directly to the Estate, via Beckemeier, on March 20, 2015. The Estate also contends that Service, the founder and former general counsel of National Foundation, as well as Gary Nead, the current President of National

12

Foundation, testified that National Foundation has never made a formal determination that it intended to retain Givens' remainder funds. However, the Estate fails to acknowledge that Givens' adult children were aware for years that National Foundation intended to retain Givens' remainder funds. As early as November 23, 2011, Whitney was aware that National Foundation intended to keep the funds. Reese testified that he had Martin contact National Foundation in January 2012 regarding this matter. By November 2012 Beckemeier was hired for the purpose of recovering his mother's money, yet the Estate waited three and a half years after Givens' death to take legal action. The Estate provided no reason, explanation or excuse for this delay. The delay is inexcusable and constitutes an implied waiver of the Estate's claim to the remainder funds.

Regarding the final element, National Foundation presented evidence that reformation of the Joinder Agreement would prejudice its pooled trust members because, in January 2013 and February 2014, National Foundation transferred Givens' remainder funds and used the funds for administrative and operational costs. The Estate relies on *The Nature Conservancy*, when asserting National Foundation is not prejudiced because National Foundation is required to make payroll and to pay administrative expenses regardless of whether or not it retained Givens' funds. *See The Nature Conservancy,* 656 F.3d 646, 649 (7th Cir. 2011) ("[a] plaintiff's delay must have prejudiced and misled the defendant, or caused him to pursue a different course from what he otherwise would have taken in order for laches to apply").

National Foundation relies on *Alexander* when arguing that its use of the funds to pay its payroll and other expenses is permissible under federal law. *Alexander v. Lewis*, 685 F.3d 325, 348-49 (3d Cir. 2012) ("Retaining the residual enables the trust to cover administrative fees and other overhead without increasing charges on accounts of living beneficiaries."). The Joinder Agreement contemplated the transfer of Givens' remainder funds to the operating account because

the Joinder Agreement states that "[i]f no secondary Contingent/Residual/Remainder Beneficiaries survive or if none are named in Section V below, then and only then shall said money remain with the trust." (Tr. Exhibit 102 at 13). Because its pool of beneficiaries fluctuates consistently, the beneficiaries who benefited from Givens' remainder funds in 2013 and 2014 are no longer trust members and it would be inequitable to charge members increased costs and fees to repay benefits they never received.

The Court concludes National Foundation presented sufficient evidence regarding its change in circumstances. Well before the Estate sent its formal demand letter asking National Foundation to transfer the remainder funds to Givens' children, National Foundation had already transferred Givens' entire remainder fund to its operating account and used the funds, not only to pay operational and payroll costs but to benefit other pooled trust members. Accordingly, because reformation would prejudice National Foundation and its current pooled trust members, the Court **grants** National Foundation's laches defense.

### III. CONCLUSION

The Estate has not presented clear and convincing evidence that Givens made a mistake and intended to transfer her remainder funds to her three children at the time of executing the Joinder Agreement. Even if the Estate's reformation claim survived, National Foundation's laches defense applies because there was an inexcusable delay in asserting the reformation claim, an implied waiver arose because the Estate knew for years that National Foundation intended to retain the remainder funds, and reformation of the Joinder Agreement would prejudice National Foundation and its current pooled trust members. For the reasons stated above, the Court finds against the Estate on their claim for reformation and in favor of National Foundation on their defense of laches.

Judgment consistent with this Entry shall now issue in a separate order.

**SO ORDERED.**

Date: 3/21/2017

_____
TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

David W. Gray
LEWIS & KAPPES PC
dgray@lewis-kappes.com

Matthew S. Tarkington
LEWIS & KAPPES PC
mtarkington@lewis-kappes.com

Suzanne R. Gaidoo
LEWIS & KAPPES PC
sgaidoo@lewis-kappes.com

James A. Beckemeier
THE BECKEMEIER LAW FIRM, LC
jbeckemeier@rlblaw.com

Wanda E. Jones
JONES LAW OFFICES
wej@indianajoneslaw.com

Jamie A. Maddox
BETZ & ASSOCIATES
jmaddox@betzadvocates.com

Kevin W. Betz
BETZ & BLEVINS
kbetz@betzadvocates.com